Next matter is In Re Diet Drugs. Mr. Rubin, good morning. Good morning, thank you, Your Honor. May it please the Court, I am Denise Rubin, representing the appellants, Carmen and Ricky Leon Coffin, who are plaintiffs in the In Re Diet Drug matters. Good. Could you kindly pull the mic down a bit? Sure. As we get this on tape. It's unfortunate. They make these things for unusually tall people. You're doing fine. Thank you, Your Honor. I think the most telling thing in the evidence that was disallowed by the district court in the form of Dr. Fortin's declaration is paragraph nine of that declaration, where Dr. Fortin explains something that I think is particularly noteworthy. Where here, the defendants and the district court argue that the plain language of the settlement agreement must be followed to the letter, and that only, in the words of the district court and echoed again by the defendants, that only a pulmonary function test with a result of greater than 60 percent lung volume is the determining factor on that criteria for PPH. What Dr. Fortin explains, and Dr. Fortin, as the court has seen in our papers, is a board-certified cardiologist, who is also not, she is not a litigation expert. She is this patient's treating physician, and has been for a number of years. She seems to say that the PFT test is no longer sufficient. Technology has changed. Correct. But what she also says, and this is the thing that I find so notable, at paragraph nine she says, pulmonary function test is a generic term used to indicate a battery of studies or maneuvers that may be performed using standardized equipment to measure lung function. They can include simple screening spirometry, formal lung volume measurement, diffusing capacity for carbon monoxide, and arterial blood gases. Insight into the underlying pathophysiology can often be gained by comparing the measured values for pulmonary function tests obtained on a patient at any particular point with normative values derived from population studies. In other words, averages. Go ahead. Ms. Rubin, isn't the, I think we've all taken a look at that and read it, but when I read her declaration, it seemed to me that she was saying, I'm a treating physician, I've seen this woman, and I think that she's in fact suffering from PPH. And I understand your opposing party to be saying, well, that's all perhaps well and good, but we're operating under a very specific agreement. And the very specific agreement is you come in with this piece of proof, and with that piece of proof you get to come out from under the settlement agreement's restriction on further lawsuits. So what's the legal significance? I'm not gainsaying your doctor's expertise or her care for her patient or your client's sincerity in believing your client's got PPH. What's the legal significance of the doctor saying, hey, I think she's got it? If that doctor agrees and acknowledges that under the standard that's in the settlement agreement, your client doesn't come up or meet the threshold test? Your Honor, that last point is the linchpin. This doctor does not agree with that point. This doctor says you cannot take the cold reading from the machine and accept it as the gospel. You have to take that reading, which now, 12 years later. Is there any other piece of medical evidence, other than the doctor's assertion that I believe she's got PPH? I mean, is there another PFT test? Is there some other piece of medical evidence that would show she needs or exceeds the greater than 60% lung capacity on a PFT test standard threshold that's in the settlement agreement? Okay. Your Honor raises several points. I'm going to try to address them one at a time. The first is a doctor's declaration is medical evidence. It is not necessarily a medical record, but it is admissible, credible evidence. No, but you're operating under a settlement agreement, and why should that not be complied with? The doctor suggests, and we agree, that it has been complied with, that if you consider the reading from the machine in the proper context, taken with other tests, with clinical evaluation, by a trained physician, that you will find that she does, in fact, meet the criteria. In order to make your point, I understand what you're trying to say. Judge Sirica talked about the settlement agreement. Don't you need to get the agreement reformed to make your claim? We suggest, Your Honor, that that might be appropriate, but that we think the district court has already done so. The district court has already said that where there is a difference of opinion about clinical diagnosis, the court is only the gatekeeper. In a different PTO and under a different test, though, correct? Yes, but the issue of law is the same. The court set a gatekeeper function and basically defined a summary judgment standard. Is there a material question of fact on this evidence? This evidence, by the way, was not rebutted. There was no medical evidence offered in rebuttal of Dr. Fortin's affidavit. Ms. Rubin, do they have to rebut it? Who's got the burden of proof here? Your client has the burden to come in and show they've complied with this piece of the settlement agreement, right? And we argue that Dr. Fortin's declaration, taken in conjunction with her other medical records, does in fact establish that standard, at least to the point of creating a material question of fact as to whether she has a proper diagnosis of PPH. There's no question on this record that she has PPH and is being treated for it. The only question that was before the district court is whether she met that 60 or greater standard. And that's the point I'm hoping to get you to confront directly. I've read carefully Dr. Fortin's declaration. I don't see in there where she says, yes, there's a test out there that shows greater than 60 percent. There's a PFT test that shows greater than 60 percent lung capacity. I think she's careful not to say that, because there isn't such a test, right? What she is saying? Well, you can go to what she is saying, but am I right in my reading of her affidavit that she does not say that there's a PFT test anywhere extant for your client showing greater than 60 percent lung capacity? She is saying that there is not a cold reading from the machine that shows 60 percent. That you cannot take that reading from this machine in a vacuum. It is based on an assumption of an average that the clinician must evaluate. I absolutely understand what she wrote, and I understand your position. Now what I'm trying to get you to wrestle with is the point that Judge Fisher was asking about. In order for us to accept that Dr. Fortin's affidavit represents sufficient evidence to allow your client to sue, one would have to say that this section, 46A2C, it no longer controls, right? Because if this section in the settlement agreement controls, no matter how persuasive Dr. Fortin's affidavit is, it's still not this thing that's laid out in precise language in the settlement agreement, right? Correct. And going back to what Judge Fisher has suggested, in the 12 years since this settlement agreement was entered, medical diagnostic procedures, medical treatment, and medical technology has progressed to a point where simply saying a PFT of greater than 60, it's misleading because it assumes that that PFT is a true measure of this patient's lung volume. It simply isn't. Did you guys, or did you and your clients make the argument to the district court that the settlement agreement had to, in fairness, be amended? We made the argument that technology has changed to the point, I believe we have, that you now must consider these other things, that because of the changes in the machine, which now uses a software-driven model that is based on an average, the old machines, as Dr. Fortin explained, the old machines, as the test was being performed, the clinician could change the dial, change the setting for the expected lung volume, so that based on the clinical evaluation and the other medical records, they could say, well, this lady doesn't have a 5.37 expected volume, she has a 5.0 or a 4.9. And it was done immediately as the test was ongoing. Was there a motion before the district court, an application in any way, before the district court to amend the settlement agreement because of what I understand you'd be saying is just not fair or accurate anymore? No, not in this instance there was not. There was certainly the argument made that given the evidence before the court and the passage of time and the progress of medical technology, the old settlement agreement, the old language simply could not stand. And what the court said was that the court was limited by the language of the settlement agreement, which said, the court, only the PFT can be considered. The settlement agreement never said that. If that's the case and it wasn't before the district court, how can we consider it? Haven't you waived it? No, the argument was made. It was not made in the form of a formal application to reform the contract, but it was made in the sense of saying, Your Honor, this language must be interpreted based on medical technology and medical expertise, which the court, with respect, simply does not have. And that is why a medical expert's affidavit is offered in any medical case, because it is beyond the ken of the court, which sits in law, but is not a medical expert. And we suggested and argued below that the district court simply did not appreciate all the changes in technology. And the example we used was... Does the district court need to? I guess that's sort of the fundamental question, right? Who does the obligation fall on to deal with the precise language of the contract, the settlement agreement? Does it fall on you and your client to go to the court and say, Change it, this hasn't kept up with medical science? Or does it fall on the opposing party to go in and say, Hey, medical science hasn't kept up and people are being unfairly treated.  Whose obligation is it to do that? I think a reasonable question. The defendants argued that my example in our papers, specifically the change in the audit percentage, when the judge in the district court changed it from a 15% audit to a 100% audit, that that was not evidence that the judge could reform the contract, because, in fact, it was made on application of all the parties. I would argue that simple good sense and equity and the interest of justice would require that where evidence is before this court, that that standard is simply not a tenable standard anymore, standing by itself. And that the court is inserting language. A pulmonary function test alone, which is not part of that agreement, the court is inserting language to essentially reform the contract on the fly. Take the alone out. Since it says pulmonary function tests demonstrate the absence of obstructive lung disease, greater than 60% predicted at rest, you're not suggesting that that language says something less than it says, are you? That's the language the district court is presented with and feels compelled evidently to apply, right? Well, the reason that I used the term earlier in my argument that it was deceptively straightforward, as Dr. Fortin has explained, it is not a test with a result. It's a panoply of tests that must be interpreted to reach a result. And that may not have been the case 12 years ago, but it is the case now. And this client is before the court now and will be deprived of any chance of redress because she has TPH. She has no redress under the settlement agreement. She is not going to be compensated under the settlement agreement that she's being bound to. These are the most seriously ill of all of the users of diet drugs. These are the people with terminal, intractable, incurable diseases. And they are being told, oh, well, technology may have changed, but you're just out of luck. This is just, it can't be. Or could there be things that you're pressing in such vigor before us, could they not be pressed before the district court? Certainly they could. Certainly, in hindsight, they should. But the question is now, has the district court done justice for this client? Has the district court, in what it called its gatekeeper function, properly ignored this evidence that it said was irrelevant to this discussion? It's certainly relevant. It's crucial to this discussion to the question of whether this plaintiff has created a material question of fact that should have gone through the state court system to be tried before a trier of fact to resolve whether or not she met that standard. Once that question of fact was demonstrated, which unquestionably it was on this record, the district court should have taken its hands off and stepped back. It did not do so. So at every step, it has made what use of the settlement agreement it could to the ends it desired. It has entered orders in 3699, and even that was back in 2004. The difference in medical technology in just those years, between 2004 and now, is mind-boggling. But even then, the court said where there is a question between medical criteria and diagnosis, where the evidence has been offered, it must be tried by a trier of fact. It is not amenable to a summary determination by the district court. Let me ask my colleagues if they have any other questions. We have none. Good. We'll have you back on rebuttal. Thank you so much. Mr. Agneswar. Thank you, Your Honors. Ann and Agneswar Arnold and Porter for the defendants at police. Picking up on Your Honor's point, Judge Jordan, the language of the provision of the settlement agreement at issue could not be more precise. For this particular condition, for lung disease, to rule out lung disease, it's got to be done by a particular test that shows a particular result. The particular test is a pulmonary function test. The particular result is a lung capacity greater than 60. Now, what's interesting about what Dr. Fortin says is there's three instances in the record where Dr. Fortin has spoken about this issue. The actual results of the PFT were a test that Dr. Fortin did at her laboratory, and what she says in that, and how she describes the results of the PFT is that a PFT was done and that it shows a total lung capacity of 56%. Then there's her first declaration that she wrote on October 12, 2011, and what she says there is the pulmonary function test reveals very modest restriction with total lung capacity of 3.03 liters, 56% of predicted. And then in her November 16, 2011 declaration, which counsel was reading several paragraphs of, she not only says that the PFT showed 56%, but she says that it was calculated in her own laboratory based on a predicted function for somebody of Ms. Cawthon's race, age, ethnicity, and gender. That was done by her laboratory. Now, what's interesting about in all three of these instances where Dr. Fortin speaks, she never says that her PFT was not 56%. She never says that it was greater than 60%. She never says anything to suggest that Ms. Cawthon actually meets the settlement agreement. Well, she says in her affidavit before us that, well, we just do not know conclusively what the true reference value for Ms. Cawthon should be, close quote. If it's in fact the case that medical science has progressed to a point where the PFT that's set forth or described in the settlement agreement is not a fair or accurate or true representation of somebody's lung capacity, is that something that the court is obligated to pay attention to that the settlement agreement doesn't reflect the real world as we understand it now? Not on this record, Your Honor. Now, I suppose, Ms. Cawthon, one thing to just keep in mind there, the dismissal of this case is without prejudice. If tomorrow Ms. Cawthon gets a PFT that's greater than 60% and she meets all the other criteria and definition, she can refile her case. If tomorrow she wants to go to class counsel and make a motion to reform the settlement agreement to say whatever she thinks it could say and Judge Bartle accepts that and reforms the settlement agreement, then maybe we'll be back in this court. But there might be other opportunities to do that. But I think also just factually, the argument is being made based on an evidentiary record that doesn't exist. Dr. Fortin never says that medical technology has changed. I mean, I've read this declaration. She just says what medical technology is today, right? Yeah. She doesn't say it was different 12 years ago. This is what Dr. Fortin is really saying, is PFTs don't tell the whole picture. I think this was your point, Judge Jordan. I'm just asking questions. I'm not making points. Take that back. The question that you asked counsel opposite wasn't what Dr. Fortin is saying. Look, I think this person has PPH, and I look at a patient. I don't look at all an amalgam of individual tests. And when I look at this patient as a whole, I really think she's got PPH, and it doesn't matter what her pulmonary function test is. It doesn't matter what her total lung capacity is. And I understand a treating physician saying that, but what we're dealing with on this appeal and what Judge Bartle dealt with in the district court is a negotiated settlement agreement that provides specific criteria that a patient must meet in order to qualify to bring this lawsuit. And there is nothing ambiguous about the criteria, and there is no suggestion in the record that that criteria is met. I take it, because it's not referenced, I take it no one else has tried to come forward with a claim that also tried to argue that there should be a different PFT test. Correct, Your Honor, and it's not in the record, but I don't believe the PFT tests have changed over the past decade or 12 years. I think it's the same test today as it was then. Whether it is or isn't, you answered my question, no one else has come forward with this claim. No, not to date, Your Honor. Just a couple other points. Counsel relied on the Dugan PTO, which involved wedge pressure. And in that particular PTO, what was at issue was the part one of the settlement definition, which requires a plaintiff to present also objective evidence that a plaintiff has a particular mean, a particular pulmonary artery pressure and a wedge pressure of 15 millimeters or less. Now, what was at issue in that case was an actual wedge pressure report. What the computer spit out, just like what a PFT would spit out, that said the wedge pressure was 14 to 16, it actually straddled the 15. And in that circumstance, Judge Bartle said, look, there's an ambiguity there in the actual test result that creates a disputed issue of fact. Different case. The analog to this case would be if the PFT itself said 56 to 64, then maybe there would be a disputed issue of fact about whether it's greater than 60 or whether it's less than 60. But there just isn't any dispute here about what the actual PFT showed. Lastly, Your Honor, unless the court has any questions, there's a lot of argument about changed circumstances and changed technology. And I just made this point a minute before, but that's nowhere in the evidence. Dr. Fortin never says that there is changed technology, never says that the settlement agreement incorporates a standard. That's archaic. What she is disputing is the use of a total lung capacity calculation period. But that's the test that the parties. Not disputing the use of the period. I think she's disputing the use of it as the sole basis on which to analyze whether somebody's got SPH, right? Yeah, that's correct. She is disputing the proposition that that should be the standard under which lung disease gets ruled out. She wants other things to be taken into account, which also, by the way, she talks about body habitus and she talks about radiography as additional indicators of what total lung capacity might be. She never applies them to Ms. Cawthon. So even if there was some underlying argument here about fairness, it's just not in this record. And with that, I would request that the court affirm the decision below. Thank you very much. Ms. Rubin? Thank you, Judge. My colleague suggests that the doctor never pointed out that there had been a change in technology. And I would direct your honors to record A809, the end of paragraph 10 and paragraph 11, where the court says automatic spirometry systems usually have built-in software that can generate a preliminary interpretation, especially for spirometry. Today, most clinical pulmonary function testing laboratories use a microprocessor-driven pneumotachometer to measure airflow directly and then to mathematically derive volume. These pre-programmed values are based on averages. However, I'm inserting an ellipsis here, based on averages actually, for persons of similar height, weight, ethnicity, et cetera. However, these figures are only averages and may vary in actual practice. I would argue that that is exactly what the judge was saying there, that the newer machines, based as they are on a software using an average, must be taken into consideration. And what the judge says is this is, yes, this was done at my university, but it uses a model. There are other models out there. This is just the model my particular university uses. And in my opinion, based on my treatment and its assessment of this patient, I am telling you, A, that the difference between 56% and 60% is not clinically valid. It's simply that they're the same for clinical purposes, number one. But even beyond that, I would say to you, says Dr. Fortin, that using even a slightly lower predicted volume, a slightly lower average, not the one in this particular machine software, she would have met the standard on the cold reading, even without my interpretation. So I would suggest that this is medical evidence. It is credible. It is admissible and should have been considered by the court to determine that there was a material question of fact. And we would ask this court, appropriately, to send it back to the Court of Common Pleas for determination on the merits. Thank you. Thank you very much. The case was very well argued. We'll take the case under advisement.